FILED

2011 Aug-19  PM 12:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

JOHNNIE WILSON and DONNA WILSON,  )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )          Case No. 6:09-cv-1343-TMP
                                   )
CENTRAL UNITED LIFE INSURANCE      )
COMPANY,                           )
                                   )
            Defendant.             )

MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment (Doc. 14) filed by defendant Central United Life Insurance Company (hereinafter "Central United") on November 30, 2010. Plaintiffs opposed the motion on December 31, 2010 (Doc. 18). It has been fully briefed and is under submission. The parties have consented to the dispositive jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

Procedural History

Plaintiffs, Johnnie and Donna Wilson, who are husband and wife, filed their complaint against defendant in the Circuit Court of Marion County, Alabama, on June 3, 2009, (Doc. 1, Notice of Removal, Exhibit A), alleging claims for breach of contract, bad faith failure to pay, statutory bad

faith, fraud, suppression, deceit, and negligence.  Defendant[1] Central United removed the action to this court on July 6, 2009.  Following the completion of discovery, the instant motion was filed.

## Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party is unable to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id.

---

[1] Although the original complaint purported to name several fictitious defendants, no such defendant has been further identified or an actual defendant substituted.  Thus, at this stage, the only defendant in the action is Central United Life Insurance Company.  All fictitious defendants are dismissed.

at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in

a form necessarily admissible at trial; however, he may not merely rest on his pleadings.  Celotex,

477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Id. at 322.

　　After the plaintiff has properly responded to a proper motion for summary judgment, the

court must grant the motion if there is no genuine issue of material fact, and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify

which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc.

v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than

show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations

omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must

"view the evidence presented through the prism of the substantive evidentiary burden," so there must

be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


## Undisputed Facts

Applying the standards described above, the following facts are undisputed or, if disputed by the parties, are taken in a light most favorable to the non-moving plaintiffs.

Johnnie and Donna Wilson purchased a supplemental cancer benefits policy from Commonwealth National Life Insurance Company of Cleveland, Mississippi, in July of 1979.  The benefits payable under the policy were in addition to benefits payable on the Wilsons' behalf for medical or hospital charges by traditional major medical insurance coverage, and the benefits were payable directly to the Wilsons, not the medical provider.  Paragraph F under the specific itemization of benefits states the following:

**F.   RADIATION THERAPY AND CHEMOTHERAPY BENEFIT: The Company will pay benefits based on actual charges for teleradiotherapy, using either natural or artificially propagated radiation when used for the purpose of modification or destruction of abnormal tissue; charges for interstitial or intracavitary application of radium or radioisotopes in sealed sources, application of radium or radioisotopic plaques or molds or the administration internally, interstitially, or intracavitarially or radium or radioisotopes in non-sealed sources, all for the purpose of modification or destruction of abnormal**

4

**tissue. Further, the Company will pay benefits based on actual charges for cancericidal chemical substances and their administration for the purpose of modification or destruction of abnormal tissue, to the extent these charges are not covered under the Drugs and Medicine benefits and the Attending Physician Benefit. This provision does not provide benefits for pre-planning laboratory tests or diagnostic X-ray related to these treatments. No limit.**

(Doc. 1, Notice of Removal, Ex. A, p. 32 of 54). In a brochure that apparently accompanied the policy, it was stated, "TREATMENT — ACTUAL CHARGES FOR X-RAY, RADIUM, COBALT, CHEMOTHERAPY, IN OR OUT OF HOSPITAL. EXCLUDES DIAGNOSTIC PROCEDURES. NO LIMIT." (Id., at p. 35 of 54).

Prior to 1997, defendant Central United Life administered the payment of benefits under similar policies under a service agreement with Commonwealth National, but in that year, Central United acquired a block of policies from Commonwealth National, including plaintiffs' policy. At that time, Central United became exclusively responsible for benefits under the policy, even though, to that time, the plaintiffs had made no claim under it. Before 2003, the benefit paid by Central United to its cancer-policy insureds for "actual charges" for radiation and chemotherapy was based upon the amount the medical provider billed the patient, even though the patient's medical insurer paid a lesser amount as full satisfaction of the billed charge. Beginning in 2003, however, Central United changed its payment practice and began paying to insured patients a benefit equal only to the amount the medical provider agreed to take as satisfaction of the billed amount. Thus, for example, prior to 2003, if a medical provider billed a patient $1,000 for a radiation or chemotherapy procedure, Central United paid its insured patient the full $1,000 as the supplemental benefit under the cancer policy, even though the patient's medical insurer fully satisfied the charge by paying the

medical provider only a fraction of the $1,000 charge. Beginning in 2003, however, the supplemental benefit paid the insured patient by Central United was an amount equal to the lesser fraction paid by the patient's medical insurer to satisfy the billed charge. The record does not reflect what supplemental cancer benefits were paid to patients who did not receive a negotiated reduction of their billed charges because they lacked medical insurance coverage. There is no evidence that this change in payment procedure was ever communicated to the Wilsons.

In March of 2007, Johnnie Wilson was diagnosed with tonsil cancer, and in June of 2007, Donna Wilson was diagnosed with breast cancer. At the time, they had medical insurance coverage provided by Blue Cross. Following radiation and chemotherapy, the Wilsons submitted to Central United the bills they received for medical treatment, totaling about $100,000. They have been paid only about $25,000 in supplemental cancer benefits under the policy.[2]

The term "actual charges" has no set or well-defined meaning in the field of health insurance. (Affidavit of Michael Morrisey, Doc. 14-3, p. 2). Since the advent of "managed care" in the mid-1980s, medical insurance carriers have negotiated with medical providers over the prices charged for medical services. This negotiated price is always less than the providers' "list price," and reflects a substantial discount from the list price. Patients who do not have medical insurance and are not covered by Medicare or Medicaid (some fifty million Americans, see State of Florida, et al., v. United States Department of Health and Human Services, et al., Slip Op., ___ F.3d ___ (11th Cir.

---

[2] In an affidavit attached to Central United's reply to the plaintiffs' motion to remand, a claims supervisor reports that, as of July 7, 2009, the Wilsons had submitted bills for radiation and chemotherapy treatments totaling $80,283.00, and they had been paid $24,867.60 in benefits. Their medical providers had accepted as full payment, as of that date, $22,811.92 for covered treatments. Also, as of June 2009, the Wilsons had paid $17,473.76 in premiums since they purchased the supplemental cancer policy in 1979.

docket nos. 11021 & 11067, Aug. 12, 2011), at p. 11), still pay the full billed amount for medical services, as they did not benefit from any reduction negotiated by a medical insurance carrier. (Affidavit of Michael Morrisey, Doc. 14-3, p. 4).

The term "actual charges" is not defined by the policy or by reference to any external regulation or agency definition.


Discussion

Central United argues that it is entitled to summary judgment as to all of the Wilsons' claims because it has paid in full all of the benefits called for under the terms of the supplemental cancer policy. It asserts that the term "actual charges" used in the policy is unambiguous, and that it means that Central United is obligated to pay a cash benefit to the Wilsons equal to the amount their medical providers have agreed to accept as full payment for the radiotherapy and chemotherapy provided them. Central United contends that "actual charges" for these services does not mean the "list price" or the "asking price" for the services, but the actual amount the medical provider is willing to accept as full satisfaction of its billed amount.

The Wilsons agree that the term "actual charges" is unambiguous, but that it means the actual billed amount sent to the patient by the medical provider, not the discounted amount the medical provider is willing to accept in payment of the bill. Defined this way, they assert that Central United has clearly breached their insurance contract by refusing to pay the full amount of the supplemental benefit required by the policy. They further argue that the defendant has done so in bad faith and has fraudulently suppressed or misrepresented the fact that it defines "actual charges" in a way that results in a substantially discounted benefit.

7

A.  The Term "Actual Charges" Is Ambiguous

Because this case is before the court on diversity jurisdiction, the court applies the law of

Alabama.  Under Alabama law, whether an insurance contract term or provision is ambiguous is a

question of law decided by the court.  See Nationwide Insurance Co. v. Rhodes, 870 So. 2d 695, 696

(Ala. 2003)("The issue whether a contract is ambiguous or unambiguous is a question of law for a

court to decide."), quoting McDonald v. U.S. Die Casting & Development Co., 585 So. 2d 853, 855

(Ala.1991.  The legal test for whether a provision is ambiguous asks, "'what a reasonably prudent

person applying for insurance would have understood [the term or provision in question] to mean.'"

Id. at 697 (quoting Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 21:14, pp. 21-23

(3d ed. 1997)); Mega Life And Health Insurance Co. v. Pieniozek, 516 F.3d 985, 991 (11th Cir.

2008)("[W]e should give the disputed term the meaning that 'a reasonably prudent person applying

for insurance would have understood'")(quoting State Farm Fire & Casualty Co. v. Slade, 747 So. 2d

293, 308 (Ala.1999)).  Stated another way, could two reasonably prudent people applying for this

insurance understand the term to mean different things?  If there is only one reasonable

understanding of the meaning of the term among people applying for this insurance, it is not

ambiguous.  But if there is more than one reasonable understanding of the term among applicants

for the insurance, it must be ambiguous.

Unfortunately, the parties have not cited any Alabama caselaw, nor has the court found any,

that expressly deals with the particular question raised by this case.  Defendant relies upon the

Middle District of Alabama decision in Claypool v Central United Life, 387 F. Supp. 2d 1199,

1203-05 (M.D. Ala. 2005), which does indeed explicitly hold, in the context of a similar

supplemental cancer policy, that the term is not ambiguous and that it refers to the amount a medical

provider is willing to accept as full payment for services, not the higher "list price."  For several reasons, however, the court is unpersuaded by Claypool, and disagrees with its conclusion that the term "actual charges" is unambiguous.

Although there is no Alabama case decision on this point, there are two cases that imply that the term is ambiguous.  The first is Liberty National Life Insurance Co. v. University of Alabama Health Services  881 So. 2d 1013 (Ala. 2003).  In this case, a cancer insurer sued a medical provider (UAB Hospital) to enjoin the hospital from billing patients for amounts greater than the hospital was willing to accept as payment for services.  As the Alabama Supreme Court described the issue:

> Liberty National alleged that UAB's billing statements to its patients who are also Liberty National policyholders often contain charges for various services that exceed the amounts UAB has accepted or will accept as full payment for those services; thus, Liberty National claims that UAB causes it to pay its policyholders amounts in reimbursements for services performed by UAB that exceed what UAB accepts as full satisfaction of those services.

> * * *

> Liberty National's complaint states that when UAB provides cancer treatment to a Liberty National policyholder, UAB issues a billing statement that some policyholders then present to Liberty National.  That statement does not reflect the actual amount UAB can charge and collect for treatments if the policyholder also receives benefits from Medicare or from some other insurance company that has a special arrangement with UAB for reimbursing its charges.  Rather, as noted, the statement reflects the charges an otherwise uninsured patient must pay, compiled using Charge Master, without regard to any limiting special program or contract.  Thus, the Liberty National policyholder, just like all other patients, receives a statement showing amounts extracted using Charge Master, amounts that are not necessarily the amounts UAB has accepted or will accept as full payment of its services.  The terms of Liberty National's cancer policies require that Liberty National pay the policyholder the full amount listed on the statement. As Liberty National states in its brief to this Court: "It is the practice of [Liberty National] to pay the insureds the amount billed by [UAB] even though the amounts are greatly inflated."

Id. , at 1016-1018.  The Alabama Supreme Court affirmed the trial court's dismissal of Liberty

National's complaint on the basis (among others) that Liberty National's cancer policyholders were

necessary parties to the dispute, but could not be feasibly added to the action.  The court said:

> Liberty National entered into contracts with its policyholders pursuant to which it
> agreed that it would pay them, depending on the particular policy, either the
> "expenses incurred" or the "actual charges" that arose from covered cancer
> treatments.  UAB contends that the relief Liberty National is seeking will have the
> direct effect of reducing the amounts Liberty National is contractually obligated to
> pay its policyholders.  Liberty National argues that the "actual charges" UAB
> generates using Charge Master are not the "expenses incurred" or the "actual
> charges" of the health-care services UAB provides to patients who have Medicare or
> some other primary insurance coverage.  Clearly, Liberty National seeks to reduce
> the amount it has to pay its policyholders who are covered by those forms of primary
> insurance for health-care services provided by UAB, to the amount UAB accepts as
> full payment for those services.  If Liberty National is successful in that regard,
> policyholders will experience a reduction in the amount of benefits now payable to
> them for cancer treatments, to whatever amount UAB accepts as full payment.

Id.  Although not on point with the case now before the court, the Alabama Supreme Court clearly

viewed "actual charges" under Liberty National's cancer policy to entail the amounts billed by UAB,

not the lesser amounts it was willing to accept as payment from a medical insurer.  Indeed, Liberty

National understood the term to mean the amount billed; that is why it filed suit to stop UAB from

sending cancer patients a statement billed on the list prices for services.  This is not binding

precedent for the instant case, but it does suggest that the Alabama courts might well see the term

"actual charges" as ambiguous, if not outright contrary to Central United's view.  Certainly, as this

court asks the question, "What would a reasonable person applying for this insurance understand the

term to mean?," it is not unreasonable to believe that such a person would understand the term to

mean the amount billed to him by the medical provider.  That possibility suggests that the term is ambiguous.

More recently, in <u>Watson v. Life Insurance Co. of Alabama</u>, ___ So. 3d ___, 2011 WL 2508238 (Ala. Civ. App., June 24, 2011), the Alabama Court of Civil Appeals implicitly addressed the question whether the term "actual charges" is ambiguous.  In that case, the trial court granted the insurer summary judgment, dismissing the plaintiff's claim of bad faith, but leaving the claim of breach of contract unresolved.  The court of civil appeals concluded that it could not review the certified appeal on the bad-faith claim because it was intertwined with the breach-of-contract claim.  The court held:

> Watson also argues that he established an "abnormal" bad-faith claim because, he says, LICOA is relying on an ambiguous term in the policy—"actual charges"—as a lawful basis for its refusal to pay his full claim. <u>See White v. State Farm Fire & Cas. Co.</u>, 953 So.2d 340, 349 (Ala. 2006) ("[I]n an 'abnormal' case [of bad faith], [an insurance company] cannot use ambiguity in the contract as a basis for claiming a legitimate or arguable reason for not paying the claim.").  We note, however, that, whether a contract is ambiguous is the threshold issue in a breach-of-contract claim. <u>Avis Rent A Car Systems, Inc. v. Heilman</u>, 876 So. 2d 1111, 1121 (Ala. 2003).  Thus, in order to determine whether the term "actual charges" is ambiguous, this court would have to determine the threshold issue in a claim that is still pending before the trial court.  Accordingly, we also conclude that the "abnormal" bad-faith claim and the breach-of-contract claim " " 'are so closely intertwined that separate adjudication would pose an unreasonable risk of inconsistent results." " ' <u>Schlarb</u>, 955 So. 2d at 419–20.
>
> Based on the foregoing, we conclude that the trial court erred to the extent that it certified its summary judgment on Watson's claim of bad faith failure to pay as final.

<u>Id.</u> at ___, 2011 WL 2508238, at *6.  It might be argued that, if the appeals court had viewed the term "actual charges" to be unambiguous, which is a question of law it could decide, it could have

concluded that the bad-faith claim was meritless and affirmed its dismissal.  Rather, by declining to

review the bad-faith claim and remanding the case to the trial court, the appeals court might have

been concerned that the term was ambiguous and had to be resolved in the breach-of-contract claim

first.  Once again this is not a firm ground for this court's decision, but it does suggest that the term

is far from certainly unambiguous.

 Although these two decisions do not supply a rule of decision in this case, they leave hints

that the two courts were concerned that the term "actual charges" as used in a supplemental cancer

policy was ambiguous.  At the very least, it appears that no Alabama case has held that the term is

unambiguous.

 The Claypool decision also seems to run counter to most decisions in other states that have

reviewed whether a similar term in a supplemental cancer policy is ambiguous.  Most courts have

held that it is ambiguous.  For example, in Guidry v. American Public Life Ins. Co., 512 F.3d 177

(5th Cir. 2007), the Fifth Circuit Court of Appeals explained under Louisiana law:

> We find that the language "actual charges" as used in the Policy is ambiguous.  On
> the one hand, "actual charges" could reasonably mean the amount the patient was
> originally billed for medical services.  This is the amount that the patient was
> "actually charged," even if the medical services provider intended to accept less from
> the patient's insurance carrier.  On the other hand, "actual charges" could reasonably
> mean the amount for which the insured is actually liable based on the discounted bill.
> Under this interpretation, the amount originally billed for medical services is the
> amount "charged," and the amount of the discounted bill is the amount "actually
> charged."

Id., at 182.  See also, Ward v. Dixie National Life Insurance Co., No. 06-2022, 2007 WL 4293319

(4th Cir., Nov.29, 2007); Pedicini v. Life Insurance Co. of Alabama, 686 F. Supp. 2d 692 (W.D. Ky.

2010) (construing "actual charges" under Kentucky law); Pierce v. Central United Life Insurance

Co., 2009 WL 2132690 (D. Ariz., July 15, 2009) (applying Arizona law); Connor v. American

Public Life Insurance Co., 448 F. Supp. 2d 762 (N.D. Miss. 2006) (applying Mississippi law).  While

these cases are based on the law of other states, they follow the same rule of construction applied by

Alabama that the ambiguity of contract language is a question of law requiring the court to give the

language its reasonable and ordinary meaning.  If the term is susceptible to more than one reasonable

reading, it is ambiguous and must be construed liberally in favor of the insured.  See Mega Life and

Health Insurance Co. v. Pieniozek, 585 F.3d 1399, 1406 (11th Cir. 2009) ("When a term is

susceptible to multiple constructions, or there is reasonable doubt or confusion as to its meaning, the

term is ambiguous as a matter of law."); Westport Insurance Corp. v. Tuskegee Newspapers, Inc.,

402 F.3d 1161 (11th Cir. 2005).

　　　　The court pauses here to note the unreported opinion of the Eleventh Circuit, applying

Florida law, in Philadelphia American Life Insurance Co. v. Buckles, 350 Fed. Appx. 376 (11th Cir.,

Oct. 23, 2009), in which the court found that the term "actual charges incurred" to be unambiguous.

It did so, however, stressing the word "incurred."  The court wrote:

> This court's task then is to apply these principles to the relevant Policy provision in
> this case: "actual charges incurred."  We conclude that the plain meaning of "actual
> charges incurred" is the "amount the provider accepts from an insurer as full
> satisfaction of the policyholder's liability."  (R.6-128 at 26.)  In Reliance Mut. Life
> Ins. Co. of Ill. v. Booher, 166 So.2d 222 (Fla. 2nd DCA 1964), after consulting
> Webster's Dictionary, the district court found "incurred" to mean that "the insured
> must have actually paid or must have become liable for."  Reliance, 166 So. 2d at
> 224; see also Ceballo v. Citizens Prop. Ins. Corp., 967 So. 2d 811, 815 (Fla. 2007)
> (finding that "to incur" an expense "means to become liable for the expense.")
> Dictionaries also provide support for our conclusion. Black's Law Dictionary defines
> "incur" as "[t]o suffer or bring on oneself (a liability or expense)".  BLACK'S LAW
> DICTIONARY 782 (8th ed.2004).

> [Plaintiff] contends that the district court's order is inconsistent, because it "considered industry practice to interpret 'actual charges' ... but then refused to do so when construing 'actual charges incurred.' " (Appellant Br. at 15.)   The district court concluded that the phrase "actual charges," standing alone, is unambiguous and refers to the total amount billed by the hospital. *That may or may not be correct*.  We find it unnecessary to consider the meaning of "actual charges" standing alone; we need only consider whether the phrase "actual charges incurred" is unambiguous. [Italics added for emphasis].

Id. at 379.  Plainly, the court of appeals did not read "actual charges incurred" and "actual charges" as the same.  It carefully distinguished them on the basis of the verb "incurred," stressing that that word tied the definition of "charge" to the amount the plaintiff became actually liable to pay.  At the very least, however, the italicized portion of the quotation makes clear that Buckles does not stand for the proposition that the term "actual charges" is unambiguous.

Next, the term is ambiguous in the real world of insurance.  Central United's own expert, Michael Morrisey, testified by affidavit that the term "actual charges" has no set or well-defined definition in the field of insurance.  Lacking a well-understood meaning, it could well be read reasonably as meaning either the charges billed to the patient or the amount the medical provider is willing to accept in full payment of a service.  Prior to 2003, even Central United had a different understanding of the term than it does today.  Liberty National had a different understanding of the term, as evidenced by its complaint in Liberty National Life Insurance Co. v. University of Alabama Health Services, 881 So. 2d 1013 (Ala. 2003).  While certainly Liberty National's understanding of the meaning of the term is not binding on Central United, it does show that reasonable people, even an insurance company, can reasonably understand it in different ways.

14

Further, Central United's reading of the term to mean the amount the medical provider is willing to accept from Medicare or a health-insurance carrier makes no sense in the context of an insured who lacks *any* primary medical-insurance coverage. For those fifty million uninsured Americans, for whom neither Medicare nor a private insurance carrier has imposed or negotiated lower rates, the term "actual charges" means, in fact, the amount *billed* by the medical provider. Thus, under Central United's reading of the policy term, for two insureds under its supplemental cancer policy side-by-side, one with primary medical insurance and one without, the term means two different things. For the patient with primary medical insurance, the term means only the amount negotiated between the medical provider and the medical-insurance carrier, even though the insured receives a bill for the full price of the provider's services. For the patient without medical insurance, however, the term means the higher sum actually billed to him by the medical provider. What greater sign of ambiguity can be shown than where the same contract language has two different meanings for similar insureds?[3]

Likewise, in the real world of a cancer patient making a claim for supplemental benefits, Central United's definition of the term leads to strange results. For example, if Central United is correct, its insured is entitled to receive a supplemental benefit only in the amount of a charge

---

[3] Central United might protest that these two hypothetical insureds are not similar, one has primary medical insurance and the other does not. But the contract relationship between Central United and its individual insureds does not hinge on whether the cancer patient has primary medical insurance coverage. Nothing in the policy limits or restricts coverage based on that fact. Central United is a supplemental insurer, not a mere excess insurer. It pays its benefits directly to its insured whether or not there is any other insurance that covers the costs of cancer treatment. If it had wished to tie its benefits to the amount the primary medical insurer paid on behalf of the patient, it could have written its policy language to say so. Rather, it chose the inartful term "actual charges," and the ambiguity inherent in it. Because the existence of primary medical insurance is irrelevant, under the language of the policy, to the operation of Central United's supplemental benefits, such insureds are indeed similar for purposes of Central United's insurance.

negotiated between his medical-insurance carrier and his medical provider.  But the patient-insured is not privy to these negotiations, nor even aware of them most of the time. When the patient receives a bill from his hospital and doctor, he can determine from the bill the amount he has been "charged." He may or may not be aware of the discount negotiated and paid by the medical-insurance carrier. It is easy enough for the patient to make a claim by submitting to Central United the medical bills he has received, but how is he to submit a claim for a lesser amount he is unaware of in some instances?  And, further, why should his medical provider and medical-insurance carrier have the power to negotiate away a portion of his valuable supplemental cancer benefit, to which they have no claim or interest?  Certainly, the medical provider and the medical-insurance carrier have an interest in reaching an accommodation between themselves on the claim for medical services, but they have no interest in upsetting the value of the patient's claim for supplemental benefits under a completely separate insurance scheme.  The value of that claim is a matter only for the patient and the supplemental insurer, and, again, there is nothing in the language of the policy that limits the value of the supplemental benefit to an amount negotiated by strangers to the insurance agreement.

The point here is simply to demonstrate that there are perfectly rational reasons to read the term "actual charges" to mean the amount billed by the medical provider.  It certainly is not *unreasonable*, from the perspective of a person applying for this insurance, to understand this term to mean the billed amount.  Nothing in the policy alerts the applicant to the possibility that the term "actual charges" means something less than the amount the applicant will be billed for cancer treatment.  The court concludes, therefore, that the term "actual charges" used in this supplemental cancer policy is ambiguous.

Having concluded that the term is ambiguous, Alabama law requires that

16

> a district court should attempt to resolve the ambiguity by applying the well-settled rules of contract construction.  [Mega Life & Health Ins. Co. v. Pieniozek, 516 F.3d 985, 992 (11th Cir. 2008)].  Ambiguity in an insurance contract is to be strictly construed against the drafter and liberally in favor of the insured.  Id. at 992-93.  If application of the rules of construction is insufficient to resolve the ambiguity, the resolution of the ambiguity becomes a task for the fact-finder.  Id. at 992.

Mega Life and Health Ins. Co. v. Pieniozek, 585 F.3d 1399, 1406 (11th Cir. 2009); see also Ohio Casualty Insurance Co. v. Holcim (US), Inc., 548 F.3d 1352, 1357 (11th Cir. 2008) ("[T]he court, as a matter of law, should apply rules of construction and attempt to resolve any ambiguity in the contract before looking to factual issues to resolve the ambiguity")(quoting Extermitech, Inc. v. Glasscock, Inc., 951 So. 2d 689, 694 (Ala.2006)).

Applicable to this case is the well-settled rule of construction that ambiguity in insurance contracts is to be resolved by liberally construing the ambiguous term in favor of the insured to afford coverage.  "Under Alabama law, a contract is ambiguous 'when a term is reasonably susceptible to more than one interpretation.' Ex parte Harris, 837 So. 2d 283, 290 (Ala. 2002) (citing Cannon v. State Farm Mut. Auto. Ins. Co., 590 So.2d 191, 194 (Ala. 1991)). When the contract at issue is an insurance policy, any ambiguity is 'to be resolved in favor of coverage.' Sullivan v. State Farm Mut. Auto. Ins. Co., 513 So. 2d 992, 994 (Ala. 1987)." Westport Insurance Corp. v. Tuskegee Newspapers, Inc., 402 F.3d 1161, 1164 (11th Cir. 2005); Mega Life And Health Insurance Co. v. Pieniozek, 516 F.3d 985, 992-993 (11th Cir. 2008) ("Any ambiguity in an insurance contract should be strictly construed against the drafter and liberally in favor of the insured."); see also Home Indemnity Co. v. Employers National Insurance Corp., 564 So. 2d 945, 947 (Ala.1990); Guaranty

<u>National Insurance Co. v. Marshall County Board of Education</u>, 540 So. 2d 745, 748 (Ala. 1989); 2 Eric Mills Holmes & Mark S. Rhodes, HOLMES'S APPLEMAN ON INSURANCE § 6.1 (2d ed. 1996).

Application of that rule of construction resolves the ambiguity in the term "actual charges," because the term is construed favorably to the insured.  This results in the term being deemed to mean the charges billed to the insured for radiation and chemotherapy in the treatment of a diagnosed cancer, even if the patient's primary medical-insurance carrier has negotiated a lesser payment to the medical provider as full satisfaction of the charge.  Further, because it is undisputed that Central United has *not* paid to the Wilsons the amounts billed to them for their radiation and chemotherapy cancer treatment, Central United cannot show as a matter of law that it has fully complied with its contract provisions.  Its motion for summary judgment on the Wilsons' claim for breach of contract is due to be denied.

### B. Bad-Faith Claim

In addition to a claim for breach of contract, the Wilsons also have alleged a claim against Central United for bad-faith failure to pay the insurance benefits.  They argue that Central United, relying on an ambiguous provision in the policy (i.e., the meaning of the term "actual charges"), has refused to pay the full amount of the "actual charges" billed to the Wilsons for their covered cancer treatment.  Central United seeks summary judgment on the basis that it is at least legally arguable that it correctly understood the term "actual charges" to mean the amount the medical provider is willing to take in full satisfaction of its charges.

Alabama law recognizes two forms of bad faith claims that may be advanced against an insurance company for its refusal to pay benefits: "normal" bad faith and "abnormal" bad faith.  <u>See</u>

18

<u>Mutual Service Casualty Insurance Co. v. Henderson</u>, 368 F.3d 1309, 1314 (11th Cir. 2004).  The

former has been described as follows:

> A party alleging that an insurance company committed "normal" bad faith has the burden of proving: (1) a breach of the insurance contract; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal; and (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason. [<u>Employees' Benefit Assoc. v. Grissett</u>, 732 So. 2d 968, 976 (Ala. 1998)].  "Normal" bad faith claims are often referred to as "directed verdict on the contract claim[s]," <u>Blackburn v. Fid. and Deposit Co. of Maryland</u>, 667 So. 2d 661, 668 (Ala.1995), because a plaintiff must show that he is entitled to a directed verdict on the breach of contract claim in order to have his bad faith claim submitted to a jury.  <u>Grissett</u>, 732 So.2d at 976; <u>Nat'l Sav. Life Ins. Co. v. Dutton</u>, 419 So. 2d 1357, 1362 (Ala. 1982).

<u>Mutual Service Casualty Insurance Co. v. Henderson</u>, 368 F.3d 1309, 1314 (11th Cir. 2004).  The

"abnormal" bad faith claim was described recently by the Alabama Court of Civil Appeals, quoting

the Alabama Supreme Court case of <u>Jones v. Alfa Mutual Insurance Co.</u>, 1 So.3d 23, 31–32 (Ala.

2008), this way:

> This [Alabama Supreme] Court has defined "normal" and "abnormal" bad faith in the following manner:
>
>> In the "normal" bad-faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim. [<u>State Farm Fire & Cas. Co. v.</u>] <u>Slade</u>, 747 So. 2d [293] at 306 [(Ala. 1999)].  In the "abnormal" case, bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) *reliance on an ambiguous portion of a policy as a lawful basis for denying a claim*.  747 So. 2d at 306–07....
>>
>> "Bad faith ... is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of a known duty, i.e., good

> faith and fair dealing, through some motive of self-interest or ill will."
> Slade, 747 So. 2d at 303–04 (quoting Gulf Atlantic Life Ins. Co. v.
> Barnes, 405 So. 2d 916, 924 (Ala.1981)). [Italics added].

Watson v. Life Insurance Co. of Alabama, ___ So. 3d ___, 2011 WL 2508238, at *4-5 (Ala. Civ. App., June 24, 2011); see also White v. State Farm Fire & Cas. Co., 953 So. 2d 340, 349 (Ala. 2006); Singleton v. State Farm Fire & Casualty Co., 928 So. 2d 280, 283 (Ala. 2005).  In the earlier case of Employees' Benefit Association v. Grissett, 732 So. 2d 968 (Ala.1998), the supreme court seemed to say that the use of an ambiguous contract provision to avoid payment is simply one form of a "normal" bad faith claim.  In Grisset, the court wrote:

> So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a "normal" case, or, failing that, can prove that the insurer's failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive. Moreover, in a "normal" case, the insurer cannot use ambiguity in the contract as a basis for claiming a debatable reason not to pay the claim.  Otherwise, an insurer would have the incentive to write ambiguous polices in order to create an absolute defense to a bad-faith claim.

Id. at 976-977; see also United Services Automobile Association v. Hobbs, 858 So. 2d 966, 974 (Ala. Civ. App. 2003).  The more recent cases of Singleton, White, and Watson, however, seem to firmly place in the "abnormal" camp a theory of bad faith grounded on the insurer's reliance on an ambiguous contract provision for its refusal to pay.

This theory of bad faith refusal to pay is the sensible recognition that insurance companies cannot draft ambiguous contract provisions and then read them favorably to themselves as circumstances suit them.  Insurers in Alabama are fully on notice that, if a contract provision is ambiguous,

20

it will be construed against them and liberally in favor of insureds to afford coverage. For this reason, insurers are not entitled to assume that ambiguous contract provisions will protect them against a bad faith claim. The insurer's failure to construe the ambiguous provision favorably to its insured is itself a bad faith refusal to recognize the obligation imposed on it by Alabama law.

The court has determined above, as a matter of law, that the term "actual charges" used in Central United's supplemental cancer policy is ambiguous. Consequently, Central United was obligated by Alabama law to itself construe the term favorably to its insureds to afford coverage for the benefits provided in the policy. Because it is undisputed that Central United did not construe the term to mean the amounts the Wilsons were billed for radiation and chemotherapy cancer treatments, it appears to have relied upon an ambiguous contract provision to partially deny coverage. Because Alabama law does not allow it to do this, Central United cannot show that it is entitled to judgment as a matter of law on the Wilsons' "abnormal" bad-faith claim. Its motion for summary judgment will be denied as to this claim.[4]

C.  Fraud and Suppression

The Wilsons also allege a claim against Central United for fraud and/or suppression, arguing that Central United either misrepresented to them the meaning of the term "actual charges" and/or suppressed the fact that Central United changed its own definition of the term to reduce the amount

---

[4] Plaintiffs' claim for "statutory bad faith" under Ala. Code § 27-12-24 (1975), pleaded as their "Third Cause of Action," adds nothing to their claim of "abnormal" bad faith. The code section is merely the codification of the tort action of bad faith failure to pay, not a separate legal theory in addition to it. See Hilley v. Allstate Ins. Co., 562 So. 2d 184, 185 n.1 (Ala. 1990) ("We do note that Ala. Code 1975, § 27-12-24, is the codification of the tort of bad faith...."); Palmore v. First Unum 841 So. 2d 233 (Ala. 2002). Thus, even though pleaded here as a separate cause of action, there is only one bad faith theory of recovery.

of benefits payable under the policy.[5]  Central United seeks summary judgment on these claim as well.

The elements of a traditional fraud claim in Alabama are as follows:

> "The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.  To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive."

Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So. 2d 1143, 1160 (Ala. 2003) (quoting Padgett v. Hughes, 535 So. 2d 140, 142 (Ala.1988)).  Similarly, a claim for deceit exists when a person makes a promise concerning a future performance knowing at the time that he does not intend to fulfill the performance and thereby intending to deceive.  See Robinson v. Sovran Acquisition Ltd. Partnership, ___ So. 3d ___, 2011 WL 480032, *4 (Ala. Civ. App., Feb. 11, 2011).  Deceit, simply, is a knowing  lie.  As applied to the facts of this case, there is no evidence of any representation made in 1979 concerning the definition and meaning of the tern "actual charges," or how the benefits would be calculated.  There is no evidence that any representative of the insurer

---

[5]  Count IV of the complaint also attempts to allege a fraud claim on the basis that, at the time the supplemental cancer policy was sold to the Wilsons in 1979, the insurer failed to tell them that the premiums for the insurance "were certain to increase" over time.  As will be discussed more fully in the text, one element of a fraud claim under Alabama law is the misrepresentation (or suppression) of a material *existing* fact.  Whether the premium costs of the insurance would increase over time was not an existing fact, but a prediction about the future.  Certainly, both the insurer and the Wilsons must have understood that the cost of everything goes up.  But even if the insurer had a duty to tell the Wilsons this regrettable truth, was it supposed to predict *how much* the premiums would rise?  And if it did not predict accurately the inflation that occurred after 1979, would that also be a claim for fraud?  Predictions about he future cannot be the basis for such a claim.

misrepresented to the Wilsons that the term meant the amount of covered charges billed to the Wilsons even though, in fact, it meant only the amount paid by Medicare or private insurance to satisfy the charges. There is no evidence of promise being made to the Wilsons in 1979 (or any other time) that benefits would be paid on the basis of billed charges as opposed to amounts paid to satisfy the medical provider. Indeed, even Central United's evidence establishes that, prior to 2003, the insurer understood the term to mean the billed amount, not the lesser amount paid to satisfy the billed charge. It is not surprising, therefore, that in 1979 no misrepresentation about this was made to the Wilsons, or that any such promise to them at that time was knowingly false, because that is how the insurer itself, at that time, was construing the language. To the extent that these species of fraud and deceit stand as separate claims from fraudulent suppression discussed below, Central United is entitled to summary judgment on them because there is no evidence that any affirmative representation or knowingly false promise was made to the Wilsons about the meaning of "actual charges" or the manner in which it would be used to calculate benefits under the policy.

The issue in this case focuses, however, on whether the change that occurred in 2003 was fraudulently suppressed, inducing the Wilsons to continue paying the premiums on their supplemental cancer policy thereafter. Fraudulent suppression is a statutory action. Alabama Code § 6-5-102 (1975), defines "fraudulent suppression" as:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

Case law has construed the statute to establish the following elements:

"To establish a claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result."

Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So. 2d 1143, 1161 (Ala. 2003) (quoting State Farm Fire & Casualty Co. v. Slade, 747 So. 2d 293, 323-24 (Ala. 1999)).  A duty to disclose a fact known to the insurer depends upon the facts of each case.  "In ascertaining whether the circumstances of the case created a duty to disclose, 'we must consider a number of factors: 1) the relationship of the parties; 2) the relative knowledge of the parties; 3) the value of the particular fact; 4) the plaintiff's opportunity to ascertain the fact; 5) customs of the trade; and 6) other relevant circumstances.'" State Farm Fire & Casualty Co. v. Slade, 747 So. 2d 293, 324 (Ala.1999) (quoting State Farm Fire & Casualty Co. v. Owen, 729 So. 2d 834, 842-43 (Ala.1998)); see also Ex parte Life Insurance Co. of Georgia, 810 So. 2d 744, 748-749 (Ala. 2001).  Moreover, the relationship or circumstances must be examined at the time of the alleged suppression.

Under the evidence in this case, the court finds there is substantial evidence supporting the plaintiffs' theory of fraudulent suppression.  The evidence on this is essentially undisputed.  Central United admits that, prior to 2003, it paid claims for supplemental cancer benefits under the "actual charges" language used in this form of policy based on the charges billed to the patient.  In 2003, the claims practices of Central United changed to calculate the benefits based not on the charges billed to patients, but on the lesser amount paid by Medicare and private health insurance carriers as full satisfaction of the medical provider's charge.  Given the long-standing tenure of the previous method

24

of calculating "actual charges" based on the billed amount, Central United had a duty to disclose to the Wilsons this change.  The Wilsons had been paying premiums for this insurance since 1979, about 24 years when the change occurred.  Central United was aware of the change, but the Wilsons were not, and there is no evidence at this point that the insurer attempted to notify them or disclose the changed method of calculation.  The method used for calculating benefits was very valuable to the parties.  As indicated in this case, the difference between paying benefits based on the amount billed and on the amount paid to satisfy the medical provider is substantial.  Here, that difference is anywhere from $55,000 to $75,000.  The Wilsons had no way of ascertaining the fact that Central United had changed the way it defined "actual charges" and, with it, the way benefits under the policy were calculated.  The insurer's failure to disclose the change to the Wilsons prevented them from making an informed choice as to whether to continue paying for the insurance after 2003 and, in that sense, induced them to continue doing so.  The Wilsons first learned of this change in 2007, when they began submitting claims following their diagnoses with cancer.

The court finds that there is substantial evidence that Central United fraudulently suppressed the fact that, in February 2003, it changed the meaning it attached to the term "actual charges" and began calculating supplemental cancer benefits in a manner that substantially reduced the value of the benefits for the Wilsons and most insureds.  Because of this, the defendant's motion for summary judgment with respect to the Wilsons' fraudulent suppression claim will be denied.

D.  Negligence

Finally, the Wilsons' "Fifth Cause of Action" alleges that the defendant was negligent in the manner in which it handled the calculation and payment of the benefits the Wilsons claim under the

policy.  Central United moves for summary judgment on this claim, arguing that this is simply a version of the plaintiffs' breach-of-contract claim dressed up in tort clothing.  The court agrees.

"The general rule in Alabama is that the mere failure to perform a contractual obligation will not sustain an action sounding in tort.  See, e.g., Barber v. Business Products Center, Inc., 677 So. 2d 223, 228 (Ala. 1996) (providing that "a mere failure to perform a contractual obligation is not a tort"); Sims v. Etowah County Bd. of Ed., 337 So. 2d 1310, 1313 (Ala. 1976) (same), over'd on other grounds, Ex parte Hale Cty. Bd. Educ., 14 So. 3d 844 (Ala. 2009)."  Temploy, Inc. v. National Council on Compensation Ins., 650 F.Supp. 2d 1145, 1153 (S.D. Ala. 2009).  Although third-parties may sue over someone's failure to perform a contractual duty when that failure results in personal injury to the third-party, a party to the contract may not assert a claim in tort for a mere failure of a contracting party to perform under the contract.  In Hamner v. Mutual of Omaha Insurance Co., 49 Ala. App. 214, 270 So. 2d 87 (Civ.1972), the appeals court discussed the line between contract actions and tort actions, explaining the following:

> "There is little question ... that the line of distinction between actions in tort and [actions in] contract is thin and often nebulous in many instances.  The courts of this State have recognized that under certain circumstances, for the breach of a contract there may be available either an action of assumpsit or [an action] in tort.  Wilkinson v. [Moseley], 18 Ala. 288 [(1850)]; Mobile Life Ins. Co. v. Randall, 74 Ala. 170 [(1883)]; Vines v. Crescent Transit Co., 264 Ala. 114, 85 So. 2d 436 [(1955)]; Garig v. East End Memorial Hospital, 279 Ala. 118, 182 So. 2d 852 [(1966)].  The theory on which the cases have been decided is often difficult to discern, but basically [it] may be stated that if there is [a] failure or refusal to perform a promise the action is in contract; if there is a negligent performance of a contractual duty or the negligent breach of a duty implied by law, such duty being not expressed in the contract, but arising by implication of law from the relation of the parties created by the contract, the action may be either in contract or [in] tort.  In the latter instance, whether the action declared is in tort or [in] contract must be determined from the gist or gravamen of the complaint. Basically, the line of division between [an action in contract and an action in] tort in such instances is [the line between] nonfeasance and

misfeasance.  If there is a defective performance there is a breach of contract and [there may also be] a tort. [William L. Prosser, The Law of Torts (4th ed.1971) p. 614.]

Ex parte Certain Underwriters at Lloyd's of London, 815 So. 2d 558, 563 (Ala. 2001)(quoting

Hamner v. Mutual of Omaha Insurance Co., 49 Ala. App. 214, 218, 270 So. 2d 87, 90-91 (Civ.

1972)).

In the case before the court, plaintiffs' negligence claim states nothing more than that Central

United failed to perform the contract by paying benefits to them less than called for under the

contract.  This is an action in assumpsit, not tort.  The Wilsons do not allege that the failure to pay

the proper amount of benefits proximately caused them some personal injury or damage to property.

Their damage is the contract damage, that is, payment of the full amount called for under the

contract.  For this reason, there is no separate claim for negligent performance of the contract.  There

is only the claim for breach of contract.  Thus, defendant's motion for summary judgment will be

granted as to the Wilsons' "Fifth Cause of Action" for negligence.

## Conclusion

Based on the undisputed facts viewed from the perspective of the plaintiffs and the other

considerations discussed above, the defendant's motion for summary judgment will be granted as

to the plaintiffs' claims for negligence, fraud, and deceit, but denied as to all other claims.[6]  A

separate order will be entered.

---

[6]  To be clear, the motion for summary judgment is denied as to the Wilsons' fraudulent suppression claim, but granted as to any claim of fraud or deceit based on an affirmative misrepresentation made when the policy was purchased or thereafter.

DONE this 19th day of August, 2011.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE